**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| TERNELL L. BROWN, <br><br>         Plaintiff, <br><br>    v. <br><br> BATON ROUGE POLICE DEPARTMENT, TROY LAWRENCE, JR., in his individual capacity, MATTHEW WALLACE, in his individual capacity, UNKNOWN FEMALE OFFICER, in her individual capacity, MURPHY PAUL, in his individual and official capacities, CITY OF BATON ROUGE, and PARISH OF EAST BATON ROUGE. <br><br>         Defendants. | No.  3:23-cv-01313 |

## COMPLAINT WITH JURY DEMAND

Baton Rouge's torture warehouse, known to BRPD's Street Crimes Unit as its "BRAVE Cave," was shuttered two weeks ago. The full horror of what the Street Crimes Unit did there, however, is still coming to light. Even those who were not beaten at the torture warehouse, we now know, were still sexually humiliated; official BRPD policy green-lit, in writing, illegal strip searches of the hundreds of detainees brought to the "BRAVE Cave."

That's what happened to Mrs. Ternell Brown, a Baton Rouge grandmother, who was stopped while carrying two different types of prescription pills (which she lawfully possessed) in the same pill container. Because BRPD officers deemed this behavior "suspicious," she was taken to BRPD's black site, where she was forced to show officers that she was not hiding contraband in her vagina or rectum. After more than two hours, they let her go without charge.

The officers who forced Mrs. Brown to spread open her vagina and buttocks were involved in numerous previous beatings of Baton Rouge civilians, but they were not acting as rogue officers when they sexually humiliated Mrs. Brown; rather, they were simply carrying out official BRPD policy. Two years ago, BRPD's policy of strip-searching BRPD citizens made national news when video emerged of BRPD officers strip-searching a child; in response to the national outrage, Chief Murphy Paul illegally targeted the lawyer who brought the footage to light, but he did nothing to change BRPD's strip-search policy. To this day, BRPD policy instructs officers that they may conduct these invasive strip searches whenever they have "reasonable suspicion to frisk" a detainee. Such a policy runs directly contrary to longstanding U.S. Supreme Court jurisprudence.

Why have misconduct complaints about the torture warehouse and the Street Crimes Unit gone ignored for so long? Two weeks ago, BRPD's Deputy Chief and Chief of Staff, Myron Daniels, opened a press conference alongside Chief Paul downplaying the allegations of wrongdoing at the torture warehouse (and misleadingly suggesting that he and Chief Paul were unaware of the allegations until August). What Daniels neglected to tell the public was that he and the head of the Street Crimes Unit, Lorenzo Coleman, are business partners. When not working for BRPD and operating a torture warehouse, the two men co-run a consulting agency called Armor Consulting Group, which offers workshops and trainings around the country on "police reform." Is it any surprise that top BRPD brass has consistently exonerated members of Street Crimes Unit accused of wrongdoing?

**NOW INTO COURT,** through undersigned counsels, comes the Plaintiff, Ternell L. Brown, who is a person of the full age of majority and domiciled in East Baton Rouge Parish, State of Louisiana, who respectfully represents the following:

## PARTIES

1.      Plaintiff TERNELL L. BROWN is a citizen of the United States and a resident of Baton Rouge, Louisiana.

2.      Made Defendants herein are:

Officers TROY LAWRENCE, JR. (P10805) and MATTHEW WALLACE (P10704) are residents of Louisiana and were employed by the Baton Rouge Police Department at the time of the events giving rise to this complaint. UNKNOWN FEMALE OFFICER is an unidentified members of the BATON ROUGE POLICE DEPARTMENT who participated in the illegal search and seizure of Mrs. Brown. All of these officers were/are so employed by the Defendants BATON ROUGE POLICE DEPARTMENT, CITY OF BATON ROUGE and PARISH OF EAST BATON ROUGE. Defendant CITY OF BATON ROUGE is a political subdivision of the State of Louisiana. The city's governing authority is consolidated with the government of EAST BATON ROUGE PARISH. Defendant PARISH OF EAST BATON ROUGE is a political subdivision of the State of Louisiana. The Parish's governing authority is consolidated with the government of the CITY OF BATON ROUGE.

3.      BRPD CHIEF MURPHY PAUL is the final policymaker for the municipal defendants as it pertains to official policy governing searches, seizures, training, discipline, use of force, and First Amendment policy for the Baton Rouge Police Department.

## JURISDICTION AND VENUE

4.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's rights as secured by the United States Constitution, as well as the deprivation of rights under Louisiana law.

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1391(b), because the defendants reside in this judicial district and the events giving rise to the claims asserted herein occurred in this judicial district.

## PLAINTIFF'S FACTUAL ALLEGATIONS

### A.    MRS. BROWN IS TAKEN TO THE TORTURE WAREHOUSE AND SEXUALLY HUMILIATED

6.      On Saturday June 10, 2023, at approximately 5:17PM, members of the Baton Rouge Police Department's "Street Crimes Unit" were patrolling the 2500 block of Plank Rd. when Det. Matthew Wallace and Off. Troy Lawrence, Jr. observed a black in color Dodge Charger.

7.      The officers ordered those inside the Dodge, Mrs. Brown and her husband, to stop by activating their lights.

8.      Those inside the Dodge complied by stopping.

9.      The officers ordered Mrs. Brown and her husband to exit the vehicle.

10.     The officers searched the vehicle without Mrs. Brown or her husband's consent or a warrant.

11.     During the search, the officers discovered several bottles of prescription medication belonging to Mrs. Brown. They opened the bottle.

12.     Mrs. Brown informed the officers a minimum of four times that she is in lawful possession of the pills as they had been prescribed to her.

13.     The officers informed her that it was illegal to have different prescription medicines in the same pill container.

14.     It is not illegal to have different prescription medicines in the same pill container.

15.     Mrs. Brown pleaded with officers and informed them that she could provide proof

that she was in lawful possession of the medication.

16.    Instead of viewing her prescriptions while still on-scene, the officers informed her that a judge would sort it out.

17.    The officers told Mrs. Brown, "We don't know if it's something you bought off the streets, or what?"

18.    The officers then forcibly (i.e., without her consent) transported Mrs. Brown to "the BRAVE Cave."

19.    "The BRAVE Cave" is an unmarked BRPD facility depicted below that was closed in September 2023 shortly after reports of torture committed by members of the Street Crimes Unit became public. It is not a jail or detention facility; no correctional staff work at "the BRAVE Cave." Rather, it is a warehouse that the Street Crimes Unit has adopted as their home base over the past several years. It is a place where BRPD takes suspects to interrogate them, gather intelligence, and attempt to "flip" them to begin cooperating with BRPD.



20.    The reason that the officers transported Mrs. Brown to the BRAVE Cave is because they suspected she might be involved in illegal drug activity.

23.    Mrs. Brown was a "detainee" who was being held while the officers investigated whether there was probable cause to arrest her for a drug offense.

24.    Mrs. Brown was held at "the BRAVE Cave" Mrs. Brown for over two hours.

25.    The officers intentionally turned off their body-worn cameras at "the BRAVE Cave," even though their investigation into Mrs. Brown was ongoing.

25.    Defendants Lawrence, Wallace, and Unknown Female Officer subjected Mrs. Brown to Strip[1] and Body Cavity[2] searches.

26.    Defendants Lawrence, Wallace, and Unknown Female Officer examined her forced her to spread her vagina and buttocks for inspection and examined her vagina using a flashlight. Defendants Lawrence, Wallace, and Unknown Female Officer did not have a warrant, probable cause, or consent to conduct either a Strip or Body Cavity search.

27.    Once satisfied that Mrs. Brown was not hiding a weapon or contraband in her rectum or vagina, she was released from "the BRAVE Cave" without charge.

28.    Shortly after her release, Mrs. Brown attempted to file a complaint in person at BRPD Headquarters. She was told that the officers had done nothing wrong and that her treatment was proper.

**B.    BRPD'S WRITTEN POLICY OF ILLEGAL STRIP SEARCHES**

29.    When officer defendants conducted their illegal search of Mrs. Brown's rectum

---

[1]    Strip Search: A visual inspection of an individual who has disrobed including the hair, mouth, ears, nostrils, groin area and buttocks to locate weapons, contraband or evidence. *See* BRPD Policy Manual General Order 281.

[2]    Body Cavity Search: A search involving not only the visual inspection of skin surfaces but the internal physical examination of body cavities and, in some instances the stomach cavity, for weapons, evidence or contraband. *See* BRPD Policy Manual General Order 281.

and vagina, they were acting pursuant to formal BRPD policy.

30.    BRPD Policy General Order No. 281 states in pertinent part:

*III. Strip Search*

   *A.  Arrestees will not be subjected to strip searches unless the officer has articulate,
   reasonable suspicion that this particular arrestee may have weapons or contraband
   on his person. **Reasonable suspicion** will be based on the following factors:*

   *1.  The nature of the offense charged;*
   *2.  The arrestee's appearance and conduct;*
   *3.  The circumstances of the arrest.*
   *4.  The arrestee's prior record. . . .*

   *C.  Strip searches may be conducted on non-arrestees based on individualized
   articulable reasonable suspicion to frisk . . . .*

   *1.  Reasonable suspicion . . . will be based on the same factors listed in III A.*

31.    The U.S. Supreme Court has made unambiguously clear that law enforcement
officers may not conduct may conduct only a "frisk," as defined in *Minnesota v. Dickerson*, 508
U.S. 366 (1993), when officers have only reasonable suspicion of criminal wrongdoing.

32.    The written BRPD policy violates the legal standard announced in *Minnesota v.
Dickerson* for searches by police officers.

**BATON ROUGE POLICE DEPARTMENT**

| General Order | Effective Date | Revised Date |
|---|---|---|
| No.281 | 11-01-1994 | 05-19-2016 |

Subject:    Search of Persons                             Reviewed 5/19/16

---

III. **Strip Search**

A. Arrestees will not be subjected to strip searches unless the officer has articulate, reasonable suspicion that this particular arrestee may have weapons or contraband on his person. Reasonable suspicion will be based on the following factors:

1. The nature of the offense charged.
2. The arrestee's appearance and conduct.
3. The circumstances of the arrest.
4. The arrestee's prior record.

B. Strip searches will be conducted under the following conditions:

1. Strip searches of arrestees will only be conducted in either a fully enclosed room that is not accessible to the public or in a fully enclosed and secure portion of a Departmental facility or other custodial facility (e.g. Parish Prison, LSU Police Department, and Scotlandville Substation).
2. Only the minimum number of individuals necessary to conduct the search will be present.
3. Only officers of the same sex as the arrestee will conduct the search. The arrestee will not be touched by any officer unless it is necessary to counter resistance.

C. Strip searches may be conducted on non-arrestees based on individualized articuable reasonable suspicion to frisk, probable cause to search, consent, or a court order.

1. Reasonable suspicion and probable cause will be based upon the same factors listed in III A.
2. The search must be conducted in a fully enclosed room that is not accessible to the public.
3. Only the minimum number of officers necessary to conduct the search will be present. No other persons will be present during the search.
4. If such a location is not immediately available, the suspect may be brought to the closest departmental facility that meets the criteria set forth above.
5. The suspect will be detained no longer than is absolutely necessary to conduct the search.
6. Only officers of the same sex as the subject of the search will conduct the search.

### C. BRPD'S LONGSTANDING PRACTICE OR CUSTOM OF ILLEGAL STRIP SEARCHES

33.    BRPD's Street Crimes Unit regularly subjects all those brought to "the BRAVE Cave" to strip searches, including non-arrestees merely suspected of criminal wrongdoing.

34.    Since January 2023, BRPD Street Crimes Unit conducted strip searches on approximately 1,000 individuals, including hundreds of individuals whose detention was based solely on reasonable suspicion of wrongdoing (or less). Hundreds of these individuals, like Mrs. Brown, were released without formal arrest.

35.    In 2021, BRPD officers' use of strip searches became a national news story when video of BRPD officers' (including Troy Lawrence, Jr.) strip search of Clarence Green and his juvenile brother was broadcast on *CBS Evening News*.

36.    In a May 2021 press conference, Chief Murphy Paul and Deputy Chief Myron Daniels defended the officers' strip searches at a public news conference.

37.    Chief Murphy Paul, with the input of Deputy Chief Myron Daniels, cleared the officers of any wrongdoing related to the illegal strip searches depicted on the video.

38.    Chief Murphy Paul and Deputy Chief Myron ensured that BRPD officers conducted strip searches consistent with General Order No. 281's instructions that strip searches could be properly based on solely on an officer's suspicion of wrongdoing.

### D. PROTECTION OF THE STREET CRIMES UNIT BY BRPD LEADERSHIP

39.    Beginning in 2018, high-ranking BRPD officials began covering up wrongdoing by colleagues in the Street Crimes Unit.

40.    In 2018, now-Deputy Chief Myron Daniels (then Internal Affairs Commander) personally shut down a meritorious Internal Affairs investigation into wrongdoing by Lorenzo

Coleman, who was tasked with running the Street Crimes Unit. Daniels was promoted to become Paul's Deputy Chief and Chief of Staff in 2020.

41.     Deputy Chief Myron Daniels personally defended illegal strip searches conducted by Troy Lawrence, Jr. in a May 2021 press conference.

42.     Deputy Chief Myron Daniels and Street Crimes Unit head Lorenzo Coleman operate a consulting group doing business as "Armor Consulting Group" (ACG) from which they gain additional income.

43.     Daniels holds himself out at the "President" of the organization; Coleman holds himself out as the "Chief Operating Officer."

44.     The two men earn additional income running ACG, which provides "consulting services."





45.    Daniels and Coleman—two men with oversight responsibility for the BRPD torture warehouse—promote themselves as offering "police reform" solutions after "a series of events [in 2020] evoked a change in the worlds [sic] social climate as it relates to law enforcement."



46.    At a press conference on August 29, 2023, called to address the allegations that the Street Crimes Unit ran a "torture warehouse," Daniels offered a false and misleading timeline regarding his and Chief Paul's knowledge about the allegations. He also falsely claimed that there was "nothing secretive" about the torture warehouse (though, ironically, Daniels kept secret his own longstanding knowledge of allegations of wrongdoing there, and also simultaneously claimed that the Street Crimes Unit officers secretly called the facility "the BRAVE Cave," unbeknownst to him or Chief Paul).

47.     Daniels stated: "Just some notes and a timeline as far as, uh, some of the things that have recently occurred. We recently received a complaint involving one of the officers associated with that case. That complaint came in as early as August 11. It was followed up by the supervisor who took the complaint on August 13. That supervisor wrote a letter to Internal Affairs to have that case investigated."

48.     In fact, the complaint regarding torture by Troy Lawrence, Jr. and other members of the Street Crimes Unit at "the BRAVE Cave" were received by Chief Paul personally in January 2023 and by Internal Affairs in April 2023.

49.     Daniels was aware of these facts when he presented his misleading timeline to the public on August 29.

50.     Because he has a business partnership with Coleman and because the two men share an interest in maintaining their reputation as police reformers, Daniels should have recused himself from an Internal Affairs or misconduct investigation into the Street Crimes Unit that Coleman oversaw.

51.     But Daniels has *never* recused himself from any Internal Affairs or misconduct investigation into wrongdoing by Coleman, the Street Crimes Unit, or individual officers associated with the Street Crimes Unit.

52.     Daniels remains involved in overseeing the investigation into Coleman, the Street Crimes Unit, and "the BRAVE Cave" to this day, despite the fact that Street Crimes Unit operations there were run by his business partner, Lorenzo Coleman.

**E.     POLICYMAKERS' DELIBERATE INDIFFERENCE TO THE OBVIOUS CONSEQUENCES OF RECURRING MISCONDUCT BY TROY LAWRENCE JR. AND MATTHEW WALLACE**

53. During Troy Lawrence Jr.'s short tenure as a BRPD officer, his dangerous temper led to numerous Internal Affairs investigations.

54. Numerous incidents have involved Troy Lawrence Jr. needless escalating ordinary encounters, strip-searching Black citizens, and responding to criticism with violence.

55. Troy Lawrence, Jr. is the son of BRPD Deputy Chief Troy Lawrence, Sr.

56. Apart from Chief Murphy Paul, Deputy Chief Troy Lawrence Sr., is currently the highest paid employee of BRPD.

57. At the time of Mrs. Brown's encounter with him, no BRPD employee with Troy Lawrence Jr.'s seniority has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr.

58. At the time of Mrs. Brown's encounter with him, no BRPD employee has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr. in the previous two years.

59. Wallace has also been investigated several times by Internal Affairs, including one recent incident involving a "death in custody."

### *CLARENCE GREEN INCIDENT*

60.     Shortly after joining the force, Ofc. Lawrence's misconduct made national news when he strip-searched a minor child in public; illegally searched that child's mother's apartment without a warrant; and then threated to beat a handcuffed detainee.

61.     Judge Brian A. Jackson (who was unaware of the threatened beating) described the January 1, 2020 incident as follows: "[T]he state agents in this case demonstrated a serious and wanton disregard for Defendant's constitutional rights, first by initiating a traffic stop on the thinnest of pretext, and then by haphazardly invading Defendant's home (weapons drawn) to

conduct an unjustified, warrantless search. Such an intrusion, in abject violation of the protections afforded by the Fourth Amendment of the United States Constitution, which protects citizens against unwarranted governmental intrusions in their homes, may justifiably be considered to be a trespass subject to prosecution under La. R.S. 14:63."

62. After the home search, when BRPD officers attempted to pressure Ms. Green into consenting to allow them to take a DNA sample from her minor child, Clarence Green (from the back of a police car) advised his mother to call a lawyer. Troy Lawrence Jr. then threatened to beat Clarence Green while he was handcuffed and locked in the back of a police car, stating: "If you don't shut the fuck up, I'm gonna come in and I'm gonna fuck you up. You think I'm playing with you? I will fuck you up."

63. Despite Judge Jackson's ruling on December 29, 2020, the filing of a civil rights lawsuit on January 2, 2021, and Baton Rouge Metropolitan Council's ratification of a $35,000 settlement on April 2021, no disciplinary investigation into Ofc. Lawrence was even *started* until (at earliest) May 24, 2021.

64. The investigation did not begin until after BRPD was contacted by journalists who had reviewed the footage that was released by the Green Family.

65. The "disturbing" footage of Ofc. Lawrence's misconduct was featured on the national nightly news program CBS Evening News on May 27, 2021.

66. On May 28, 2021, Deputy Chief Myron Daniels and Chief Murphy Paul convened a press conference to address the national controversy caused by Troy Lawrence, Jr. and his colleagues.

67. At the press conference, the first question posed by journalists was: "This happened almost 17 months ago. Would we be here talking about this today if that video had not come out?" Chief Paul responded: "Absolutely we would have. . . . We just had the last hearing, what was it, the 13[th]

I believe? The 13th of this month was our last hearing. And we still have two other officers that we have not completed that investigative process. So yes, we still would have made that information available to the public once those administrative processes have concluded."

68. Chief Paul omitted that the investigation into Ofc. Lawrence was not started before May 24, 2021.

69. BRPD conducted an investigation into Troy Lawrence Jr.'s role in the Green Family case and Chief Paul and Deputy Chief Daniels personally reviewed the results.

70. BRPD cleared Lawrence of any violation of a "use of force" or search-and-seizure policies in connection with the initial stop of, initial search of, and threatened violence against Clarence Green and his brother. As Chief Paul stated at the press conference, the strip-searches conducted of Green and his brother were consistent with and approved under BRPD policy.

71. On January 19, 2023, Ofc. Lawrence testified under oath about the aforementioned incident.

72. Ofc. Lawrence swore that he "was suspended for cursing, using profanity."

73. Ofc. Lawrence swore that he had no idea he was one of the "John Doe" defendants named in Clarence Green's civil rights suit.

74. Ofc. Lawrence swore that he had no recollection of being featured on a national news broadcast or that Chief Paul had convened a press conference to discuss the incident he was involved in.

75. Ofc. Lawrence swore that he did not believe that he had assaulted Clarence Green by threatening to "fuck him up" while he was handcuffed.

76. Ofc. Lawrence received no additional training, counseling, or anger management in connection with this incident. Ofc. Lawrence was never told by anyone in BRPD that he had done

anything wrong by strip-searching a child in public based on reasonable suspicion (or less) of wrongdoing.

### *SHERMANIE REED INCIDENT*

77. Ofc. Lawrence also used force and violence against another motorist, Shermanie Reed, who (correctly) told him he was acting unprofessionally on October 31, 2020.

78. Ofc. Lawrence grossly misrepresented the details of the encounter in a police report (and subsequent Internal Affairs investigation). Though Internal Affairs knew or should have known that Lawrence lied throughout his Internal Affairs investigation, no action was taken against him for his obvious lies.

79. Chief Paul personally and BRPD as an organization found that Ofc. Lawrence's conduct was consistent with BRPD policy (apart from muting his body-worn camera).

80. BRPD conducted an investigation into the case and Chief Paul personally reviewed the results.

81. Ofc. Lawrence's interview with Internal Affairs included numerous obvious false statements.

82. The investigation cleared Ofc. Lawrence of all wrongdoing in that case apart from muting his body-worn camera.

83. In September 2021, counsel for Ms. Reed wrote Parish Attorney Andy Dotson to alert him to Lawrence's misconduct and to highlight misrepresentations in his Internal Affairs interview. The letter sought a meeting with Chief Paul regarding the incident.

84. Andy Dotson did not respond.

85. Reed sued Lawrence and Chief Paul for false arrest, excessive force, and First Amendment retaliation on October 30, 2021.

86. Her complaint emphasized that Ofc. Troy Lawrence already "boast[ed] a lengthy record of professional misconduct during his short career."

87. In numerous conversations in late 2021 and early 2022, BRPD's attorney was advised by Reed's counsel that Lawrence was likely to maim or seriously injure someone in a future incident if they failed to intervene.

88. At Lawrence's deposition on January 19, 2023, he repeatedly lied about the facts of the case.

89. On January 21, 2023, BRPD's counsel was sent another letter highlighting examples of Ofc. Lawrence's perjury in his deposition and reiterating counsel's ongoing concerns: "Officer Lawrence is going to seriously injure or kill someone if he remains on the force. It is disheartening to learn that, since the filing of this lawsuit, Officer Lawrence has been *suspended* at least three (3) additional times for on-the-job misconduct and is currently the subject of an internal investigation for additional police brutality in December 2022."

90. Within two months of Ofc. Lawrence's deposition, BRPD agreed to a $55,000 settlement to resolve the claims arising from that incident.

91. Ms. Reed was willing to settle for $40,000 and an apology, but Lawrence and BRPD refused to authorize the settlement.

92. Both Lawrence and BRPD still maintain that Lawrence did nothing wrong apart from muting his body-worn camera during his encounter with Ms. Reed.

93. Ofc. Lawrence received no additional training, counseling, or anger management in connection with this incident.

94. Throughout Shermanie Reed's lawsuit against Troy Lawrence Jr. and BRPD, the Department withheld information from their own lawyers regarding Troy Lawrence's

misconduct. The department even altered and redacted responsive documents to hide the names of witnesses who would have pertinent information regarding Ofc. Lawrence's violent tendencies.

95. Throughout the litigation, BRPD's counsel was repeatedly advised by Ms. Reed's counsel that Ofc. Lawrence posed an ongoing danger to the people of Baton Rouge.

### *TROY LAWRENCE TRIES TO FIGHT HIS COLLEAGUES*

96. Ofc. Lawrence has twice been the subject of Internal Affair investigations for altercations with a 20-year veteran of BRPD, Cody Gunter.

97. On July 19, 2021, Ofc. Lawrence disregarded a direct order from Sgt. Gunter, telling him, "I don't give a fuck who you are."

98. Ofc. Lawrence was suspended for 25 days.

99. On March 6, 2022, Ofc. Lawrence called Sgt. Gunter "a pedophile" and attempted to fight him in public.

100.    Ofc. Lawrence stated, "I'll fuck you up right here in front of everybody."

101.    Ofc. Lawrence then took off his vest and attempted to fight Sgt. Gunter, who walked away to deescalate the situation.

102.    Ofc. Lawrence then called Sgt. Gunter "a pussy" a told him that he was going to "kick [his] ass."

103.    The events occurred in front of a crowd of college students.

104.    When Sgt. Gunter returned to his car, Ofc. Lawrence followed him, yelling, "Get out the car you pussy."

105.      Under oath, Sgt. Gunter explained to Internal Affairs that he believed Ofc. Lawrence was dangerous and that he did not want to work in his presence. He expressed his fear: "I don't know what he is capable of."

```
issue with me."


~Do you have any personal vendettas against Ofc. Lawrence?
████████████ replied, "No."


~Is there any reason that you feel you cannot work with or
in the presence of Ofc. Lawrence and if so, please explain?
████████████ replied, "I would not be comfortable working in
the presence of Ofc. Lawrence because I don't know what he
is capable of.  I feel that he has a lot anger towards me
and it's not going away."
```

137.      Ofc. Lawrence was suspended for this latter incident, as well.

138.      In at least one of the incidents, Ofc. Troy Lawrence Sr. was made aware of his son's wrongdoing as the incident was happening, and was asked by other BRPD officials to intervene with his son

139.      Ofc. Troy Lawrence Sr. was told that his son would be arrested if he did not promptly report to superior officers in connection with one of his altercations with Sgt. Gunter.

### LAWRENCE AND WALLACE CONSPIRE IN DEC. 2022 BEATING

136.      On December 22, 2022, local television station reported a story entitled "BRPD Opens Internal Investigation after Cell Phone Video Captures Violent

Confrontation." *See* https://www.wbrz.com/news/brpd-opens-internal-investigation-after-cell-phone-video-captures-violent-confrontation/ (last accessed Sept. 17, 2023).

137.    The video in question depicts Lawrence repeatedly striking a handcuffed individual in the back of a police car while Wallace attempts to force his way into a house without a warrant.

138.    When questioned about the incident under oath on January 19, 2023, Ofc. Troy Lawrence Jr. claimed to have no recollection of the incident and no knowledge of any Internal Affairs investigation into the incident. He also claimed to have no idea who the man forcing his way into the house (his partner, Wallace) was.

139.    Lawrence's testimony was improbable because, *inter alia*, it was one of the few times he had recently completed a use of force report regarding the incident, one of the few times he had ever done so during his BRPD career.

140.    Two hours later, Troy Lawrence Jr. conducted a lengthy interview with Internal Affairs during which he provided a detailed account of the incident which exonerated both him and Wallace of any wrongdoing from the incident.

141.    Wallace also provided a misleading and self-serving account of the incident.

142.    Daniels personally cleared Lawrence and Wallace of wrongdoing connected to the incident.

143.    Chief Paul's attorney was informed almost immediately after the deposition in January 2023 that Lawrence had committed perjury throughout his deposition, including (specifically) his claims that he did not recall the recent beating depicted on the video.

### *CHAVIS/SANDERS INCIDENT*

140.     In yet another recent incident, Ofc. Lawrence publicly attacked two young Black citizens and their mother after they (correctly) criticized him for acting unprofessionally.

141.     On October 8, 2022, Ofc. Lawrence picked a fight with two young men— Holden Sanders and Emanuel Chavis—after BRPD officers shot their cousin, Malik Chavis.

142.     Ofc. Lawrence profanely ordered the men to leave the grounds of a hospital.

143.     When the men informed him that he was acting unprofessionally, he physically attacked them both.

144.     The assault involved grabbing Holden Sanders by the neck and hair, as Ofc. Lawrence unsuccessfully sought to rip him out of his car.

145.     Other (non-BRPD) officers witnessed the attack, but refused to join in Ofc. Lawrence's brutality, even as he screamed at them: "CAN Y'ALL FUCKING HELP?! . . . WHAT THE FUCK ARE Y'ALL DOING?! YOU'RE NOT GOING TO HELP?!"

146.     He also physically attacked their mother.

147.     Ofc. Lawrence sadistically placed extremely tight handcuffs on Emanuel Chavis, and in response to his repeated requests to loosen the cuffs, responded: "Well, whenever you fight with me . . . that's what happens."

148.     As in this case, Ofc. Lawrence made up false allegations that Chavis and Sanders engaged in criminal conduct justifying his brutality.

149.     All criminal charges against both men were recently dropped.

### *WALLACE AND LAWRENCE SEND JEREMY LEE TO THE HOSPITAL*

140.    In yet another recent incident, Wallace and Lawrence publicly stripped a young Black man and then beat him so badly he was hospitalized

141.    On January 9, 2023, BRPD arrested Jeremy Lee, who is 21 years old, 5'6", and weighs 125 pounds without reasonable suspicion or probable cause.

142.    Jeremy Lee yelled in pain while Lawrence and Wallace pulled down his pants and searched him.

143.    While Mr. Lee was handcuffed and on the ground, Lawrence told him, "I'm about to bat the living crap out of you."

144.    Frightened and seeking some kind of fairness, Mr. Lee told Lawrence and Wallace to "turn your [body-worn] camera on" and to "bat me then."





145.     A large crowd gathered nearby to witness BRPD activity.

146.     Lawrence began to argue with members of the crowd. Lawrence and one woman got into an argument during which he told her to "keep talking" and dared her to "show me."

147.     When another crowd member told Lawrence he was acting unprofessionally, Ofc. Lawrence called the man "ignorant" and bragged about how much money he had.

148.     The argument nearly escalated into a physical altercation.

149.     Another BRPD officer intervened to separate Lawrence from the agitated crowd.

150.     After being separated, Lawrence tried to walk back over to the crowd to taunt them more, but two officers intervened to talk him down and walk him away. One explicitly told him to "chill out." Even his fellow officers saw his capacity for escalation and dangerousness.

151.    Instead of taking Mr. Lee to the East Baton Rouge Parish Prison, Wallace and Lawrence took Mr. Lee to the same torture warehouse where Mrs. Brown was sexually humiliated.



152.    While there, they took him out of a holding cell and severely beat him.

153.    Lawrence and Wallace repeatedly punched and kicked Mr. Lee.

154.    Mr. Lee was so badly beaten that authorities at East Baton Rouge Parish Prison refused to accept him when Wallace and Lawrence attempted to transfer Mr. Lee to their custody, insisting that Mr. Lee be taken to the hospital.

155.    Mr. Lee was diagnosed with broken ribs and other physical injuries as a result of his beating.

156.    Lawrence and Wallace constructed a false police report accusing Mr. Lee of attempting to escape from the torture warehouse.

157.    Lawrence accused Mr. Lee of committing a "battery" against him, though the narrative portion of the report does not actually claim that Mr. Lee ever touched him.

158.    Though Lawrence resigned shortly after the torture warehouse allegations became public, no disciplinary action has been taken against Wallace.

159.    Neither Wallace nor Lawrence were retrained nor disciplined following the beating of Jeremy Lee in January 2023; no officer was disciplined for the beating of Jeremy Lee in violation of BRPD Policy Manual General Order No.3:19, 3:20, 22, 23[3];  and no BRPD officer was disciplined for failure to follow BRPD Policy Manual General Order No. 135[4] as it relates to record of Jeremy Lee's medical treatment.

160.    BRPD Chief Murphy Paul personally received a complaint regarding the torture warehouse and Wallace/Lawrence's misconduct in January 2023; a second Internal Affairs complaint was received in April 2023.

161.    Tragically for Mrs. Brown, it was only when the *public* learned of these allegations in September 2023 that the torture warehouse was shuttered and Lawrence was forced out of BRPD.

162.    If BRPD's Chief had responded to the complaints, Mrs. Brown's sexual humiliation (like the sexual humiliation of scores of other Baton Rouge citizens harmed at the torture warehouse) would not have occurred.

---

[3] **General Order No. 112- 3:19**- Falsification of Documents-No employee shall willfully falsify any form, report, or document.; **General Order No. 112- 3:20**-Use of Force- Every member of the Department shall use only the force necessary to affect an arrest or maintain custody of a suspect. All members shall abide by the provisions of the Departmental policy with respect to the use of Non-Lethal Force and the Use of Deadly.; **General Order No. 112- 3:22**-Violation of Laws- No member will willfully or by neglect or omission violate any Federal, State or City ordinance, or statute.; **General Order No. 112- 3:23**- Truthfulness- Every member of the Department is required to be truthful except while conducting investigations that require surreptitiousness.
[4] **General Order No. 135- II. Notification of Supervisor– C.** The first concern is to provide medical attention to the injured. If the primary employee is hospitalized, the supervisor will make the appropriate assignments to carry on the investigation. If the subject is hospitalized, he will remain under guard until booked. Upon release, the employee booking the subject will obtain medical release forms and attach copies to the Use of Force Report. Any injured employee will make available to the department copies of his medical reports as needed.

### WALLACE'S OWN TROUBLED HISTORY

163.    Separate and apart from his longstanding involvement in Street Crimes Unit

wrongdoing—including the torture of Jeremy Lee and the sexual humiliation of Mrs.

Brown, both alongside Troy Lawrence, Jr.—Matthew Wallace has his own troubled

history.

164.    In January 2021, he was found to have violated BRPD conduct and social media

policies and was disciplined.

165.    Two weeks earlier, he was involved in the in-custody death of Terry Baggett, who

died while in BRPD custody for a marijuana offense. He was investigated by BRPD

homicide detectives but cleared of wrongdoing.


### F.    BRPD'S LONG HISTORY OF RETALIATING AGAINST CRITICS AND FOSTERING A CULTURE OF IMPUNITY FOR POLICE VIOLENCE

165.    The reason the Street Crimes Unit was able to operate their torture warehouse for

so long, in addition to the foregoing, is because of a policy of retaliation against anyone who

dared speak up against BRPD. This policy was developed, implemented, and put into practice by

Deputy Chief Myron Daniels and Chief Murphy Paul.

### CLARENCE GREEN RETALIATION

166.    When Ofc. Lawrence's wrongdoing in the Clarence Green matter became a national

news story, BRPD filed a petition in state court seeking to have the Green Family's

attorney held in contempt for releasing the body-worn camera footage; the statutory

penalty for the species of contempt sought by BRPD was up to six months'

imprisonment. In a 92-page opinion, Judge John W. deGravelles subsequently issued

an injunction halting this prosecution, rejecting the applicability of "*Younger*

abstention" and "find[ing] the overwhelming evidence in this case shows that the City/Parish acted in bad faith and in retaliation against Frampton for Frampton's issuance of a press release and Video which cast BRPD in a bad light." *Frampton v. City of Baton Rouge/Par. of E. Baton Rouge*, 21-CV-362-JWD-SDJ, 2022 WL 90238, at *35 (M.D. La. Jan. 7, 2022). Baton Rouge taxpayers paid over $85,000 to settle the lawsuit. BRPD still maintains that they did nothing wrong in retaliating against the attorney who served as a whistleblower in exposing Ofc. Lawrence's misconduct.

### *ALTON STERLING RETALIATION*

167.    In response to BRPD misconduct, thousands of Louisiana residents protested BRPD in 2016. BRPD responded with mass arrests of the protesters. Protestors argued the arrests were in retaliation for their exercise of their First Amendment rights to criticize BRPD, and their Fourth Amendment rights. They asserted *Monell* claims against BRPD and Baton Rouge, arguing that the wrongdoing was not just the result of individual official wrongdoing, but rather a policy or custom attributable to Baton Rouge itself.

168.    This Court rejected defendants' efforts to dismiss the protestors *Monell* claims. *See* Ruling and Order, *Imani v. City of Baton Rouge*, Case 3:17-cv-00439-JWD-EWD, Dkt. 347 (July 14, 2022). The City of Baton Rouge settled the case mid-trial for $1,170,000.

### *INTERNAL WHISTLEBLOWER RETALIATION*

169.    After criticizing BRPD leadership, BRPD union vice president Siya Creel was unlawfully terminated by BRPD Chief Murphy Paul. The Municipal Fire & Civil Service Board unanimously decided Creel was wrongfully terminated.

East Baton Rouge City-Parish ultimately paid $90,000 to settle Creel's claims of retaliation. A veteran officer in the BRPD Internal Affairs Division, John Dauthier, has also accused BRPD Chief Murphy Paul of internal wrongdoing, publicly claiming "blatantly partial doctrine for enforcing policies of the BRPD." Dauthier has alleged that he was retaliated against in part because he criticized BRPD leadership, whereas other officers who were well-liked by BRPD leadership were either not disciplined or less severely disciplined for similar wrongdoing.

### SYSTEMIC FAILINGS

170.    In April 2023, the non-profit news outlet VERITE released an extraordinary six-part expose called "In The Dark," documenting systemic BRPD violence and hostility toward those who questioned BRPD. *See* https://veritenews.org/tag/baton-rouge-police-department/ (collecting stories). Among other revelations, VERITE reported that the *sole* police officer investigated (let alone disciplined) for wrongdoing in connection with the 2016 protests was a BRPD officer who was investigated for questioning the legality of the police response at the protest. This reporting was accurate. VERITE reported that 100% of use-of-force complaints made in 2017 were adjudicated "exonerated" or "not sustained" by BRPD Internal Affairs. This reporting was accurate.

171.    The reporting also documented a department plagued by a culture of impunity, with meritorious citizen complaints regularly disregarded. Apart from minor errors that have since been included flagged as "Corrections" to the public available articles, there are no inaccuracies in the VERITE reports.

172.    Illustrated above are several instances of Constitutional violations of American

citizens' Fourth Amendment right to be free from unreasonable searches, seizures, arrests and excessive force. Plaintiff maintains that over the last several years the actions of BRPD officers which violated state and federal laws and offended citizens' Constitutional rights were condoned by BRPD. In all of the above instances, complaints were filed with the Baton Rouge Police Department or were attempted to be filed before the complainant was turned away. These complaints did not result in discipline for the offending officers. Furthermore, these acts clearly illustrate that the Baton Rouge Police Department, Chief Paul, and the City of Baton Rouge, are complicit in the actions of their Officers, which violated citizens Fourth Amendment rights. These acts also illustrate that the Defendants were aware of the repeated violations, and that the Defendants have failed to take reasonable measures to mitigate and/or cease these acts by their officers.

## CAUSES OF ACTION

### COUNT I
### Violation of 42 U.S.C. § 1983: Unreasonable Search (Fourth Amendment)

173.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

174.    As more fully described above, Defendants Troy Lawrence, Jr., Matthew Wallace, and Unknown Female Officer deprived Plaintiff of her constitutional right to be free from unreasonable searches.

175.    As a direct and proximate result of this deprivation of his constitutional right to be free from unreasonable searches, Plaintiff suffered injuries, both physical and emotional.

### COUNT II

**42 U.S.C. § 1983: Unreasonable Seizure (Fourth Amendment)**

176.    Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

177.    As more fully described above, Defendants Troy Lawrence, Jr. and Matthew Wallace deprived Plaintiff of her constitutional right to be free from unreasonable seizure.

178.    Defendants seized her without a warrant and without probable cause.

179.    As a direct and proximate result of this deprivation of her constitutional right to be free from unreasonable seizures, Plaintiff suffered injuries, both physical and emotional.

**COUNTS III and IV**
***Monell* Liability for Counts I and II**

180. Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein against BRPD and all municipal defendants.

181.    Plaintiff further allege that BRPD maintains and implements formal written policies authorizing illegal strip-searches predicated on "reasonable suspicion" that caused the constitutional violations alleged in this complaint.

182.    Plaintiffs further allege that there is a pattern, practice, custom, and informal policy of false arrests, excessive force, unlawful seizures, and strip searches; that this widespread recurring practice is so permanent and settled that it constitutes formal policy; and that adherence to that practice caused the constitutional violations at issue in this complaint.

183.    Plaintiffs further allege that Lawrence and Matthews were inadequately trained regarding Fourth Amendment seizures and searches; that this inadequate training caused their constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

184.    Plaintiffs further allege that Lawrence and Matthews were inadequately supervised; that this inadequate supervision caused their constitutional injuries; and that BRPD and the Parish-City were deliberately indifferent to the constitutional rights injured.

185.    Plaintiffs further allege that Lawrence and Matthews were inadequately disciplined; that this inadequate discipline caused their constitutional injuries; and that BRPD and the Parish-City was deliberately indifferent to the constitutional rights injured.

186.    Plaintiffs further allege that Lawrence and Matthews' conduct has been authorized, approved, and ratified by Chief Murphy Paul, who wields final policymaking authority for BRPD in the relevant fields.

### Counts V, VI, VII, VIII, IX
### State Law Claims: Battery, Assault, Intentional Infliction of Emotional Distress, False Imprisonment, Negligence.

187.Plaintiff repeats and realleges all of the paragraphs in this complaint as if fully set forth herein.

188.As more fully described above, all defendants (including the City of Baton Rouge, East Baton Rouge Parish, BRPD, and Chief Murphy Paul) are responsible and liable to Plaintiff for the damages and injuries Mrs. Brown has suffered as a result of Defendants' actions and/or inactions pursuant to:

A.  Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair  it;"

B.  Louisiana Code of Civil Procedure Article 2316, which provides that "[e]very person is responsible for the damage he occasions  not merely by his act, but by his negligence, his imprudence, or his want of skill;"

C.  Louisiana Code of Civil Procedure Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but  for that which is caused by the act of persons for whom we are answerable, or of the things which  we have in our custody;" and

D. Louisiana Code of Civil Procedure Article 2320, which provides that "[m]asters and employers are  answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed…responsibility only attaches, when the masters or employers…might have prevented the act which caused the damage, and have not done it."

189.

**Battery** - "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact[.][5]

In the instant case, officers with the Baton Rouge Police Department, in their capacity as officers employed by BRPD,  initiated contact with Ms. Brown for possible traffic violations. She was subsequently taken to the BRAVE CAVE for over two hours where she was subject to unconstitutional Strip and Body Cavity searches. After the unconstitutional searches she was released from the facility without being charged with a crime.

**190.**

**Assault** - 'a threat of such a harmful or offensive contact."[6]

In the instant matter, an assault occurred when Mrs. Brown was detained by BRPD officers on the scene of the traffic stop and was placed in the back of a marked unit which she physically could not fit into despite her visual discomfort. A second assault occurred when Mrs. Brown was illegally arrested and removed from the presence of her husband despite providing proof at the scene of her original detention that she was lawfully in possession of her prescription medicine. A third assault occurred when Mrs. Brown was subjected to an offensive, unwarranted, and invasive search of her person in an open warehouse by an unknown female BRPD officer. All the above

---

[5] *Cage v. Wood*, 484 So.2d 850 (La.App. 1st Cir.1986); *Ross v. Sheriff of Lafourche Parish*, 479 So.2d 506 (La.App. 1st Cir.1985); *Vascocu v. Singletary*, 404 So.2d 301 (La.App. 3d Cir.1981); *Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293 (5th Cir.1982); Restatement (Second) of Torts, American Law Institute § 13 (1965); F. Stone, Louisiana Civil Law Treatise, Tort Doctrine § 124—130 (1977); W. Prosser and W. Keeton, The Law of Torts, § 9 (5th ed. 1984); F. Harper and F. James, The Law of Torts, § 3.1—3.3 (2nd ed. 1986).
[6] *See* 512 So. 2d 389 (La. 1987).

listed instances were assaults as they placed Mrs. Brown in apprehension of receiving further injury at the hands of BRPD Officers.

191.

**Intentional infliction of emotional distress- "**the Louisiana Supreme Court has outlined the three elements a plaintiff must establish in order to bring a claim for intentional infliction of emotional distress: 1) extreme and outrageous conduct by the defendant; 2) severe emotional distress suffered by the plaintiff; and 3) the intent by the defendant to inflict severe emotional distress or the knowledge that severe emotional distress was certain or substantially certain to result from the defendant's conduct."[7]

In the instant case, extreme and outrageous conduct was exhibited by BRPD officers which caused the intentional infliction of emotional distress upon the Plaintiff when Mrs. Brown was held for over two hours where she was subject to unconstitutional Strip and Body Cavity searches, whereby she was made to open her buttocks and vagina. After the unconstitutional searches she was released from the facility without being charged with a crime.

192.

**False imprisonment–** is the intentional confinement or detention of another, without his consent and without proper legal authority.

In the instant matter, Mrs. Brown was held for over two hours in the "BRAVE Cave" where she was subject to unconstitutional Strip and Body Cavity searches without probable cause or an arrest warrant. After the unconstitutional searches she was released from the facility without being charged with a crime.

193.

**Negligence–** In order to prevail in a negligence action, a plaintiff must prove the following five elements:  (1) the defendant had a duty to conform his conduct to a specific standard of care; (2) the defendant's conduct failed to conform to the appropriate standard of care

---

[7]*White v. Monsanto Co.*, 585 So.2d 1205, (La. 1991); *Karl J. Pizzalotto, M.D., Ltd. v. Wilson*, 437 So.2d 859 (La.1983); *Coppage v. Gamble*, 324 So.2d 21 (La.App. 2d Cir.1975); F. Stone, Louisiana Civil Law Treatise, Tort Doctrine, § 125—127 (1977); F. Harper and F. James, The Law of Torts, § 3.3 (2nd ed. 1986). Cause of action for intentional infliction of emotional distress is viable in Louisiana, generally in accord with legal precepts set forth in Restatement (Second) of Torts. LSA-C.C. art. 2315.

[breach of duty]; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) the plaintiff was damaged.[8]

194.    In the instant matter, the Defendant officers had a duty to conform their conduct to a specific standard of care, i.e., respect for Plaintiff's constitutional rights. Chief Paul, BRPD, and the municipal defendants had a duty to do likewise. Moreover, the substandard conduct of the defendants directly led to and was the cause-in-fact of the Plaintiff's various injuries. Therefore, the officers breach of duty (misconduct) was the legal cause of the Plaintiff's injuries and the cause of her damages.

195.    No reasonably prudent officer would have initiated an illegal seizure of Mrs. Brown, nor would a reasonably prudent officer initiate unwarranted strip and body cavity search. Nor would a reasonably prudent officer initiate or carry out violations of citizens constitutional rights. Moreover, Wallace, Lawrence, and the Unknown Female Officer all had knowledge that severe emotional distress was substantially certain to result from their conduct.

196.    As a result of the abovementioned torts, Mrs. Brown has suffered damages including: (1) deprivation of her right to be free from unreasonable searches and seizures; (2) mental and emotional injury; (3) pain and suffering; and (4) any other special and general damages and expenses, in an amount to be proven at trial.

**Count VII**
**State Constitutional Violations**

197.    The actions and/or inactions of Wallace, Lawrence, and other Unknown Officers are violations of Section 5 of the Louisiana Constitution of 1974 for the following reasons:

Louisiana Constitutional Article I §5 states: "every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches,

---

[8] *Fruge v. ONOB, Inc*., Court of Appeal of Louisiana, Third Circuit, 32 So.3d 1115.

seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court."

In the instant matter, BRPD Officers violated the Plaintiff's rights Section 5 to be free from unreasonable searches, seizures and invasions of privacy when Baton Rouge Police Department officers, in their capacity as officers employed by BRPD, was illegally seized and transported her to the BRAVE Cave for over two hours where she was subject to unconstitutional Strip and Body Cavity searches. After the unconstitutional search, seizure and invasion of privacy she was released from the facility without being charged with a crime.

## JURY TRIAL DEMAND

198. Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

199.    The Plaintiff respectfully requests:

   **A.** Compensatory damages as to all Defendants;
   **B.** Special Damages as to all Defendants;
   **C.** Punitive damages as to all Defendants sued in their individual capacity;
   **D.** Reasonable attorneys' fees and costs as to all Defendants; and
   **E.** Such other and further relief as may appear just and appropriate.


**WHEREFORE**, Plaintiff, Ternell L. Brown does pray that a copy of this Complaint is served upon all of the Defendants named herein, and that after all proceedings a judgment is rendered in favor of Plaintiff and against all Defendants jointly, severally, and/or *in solido* and that said judgment is in excess of three million dollars ($3,000,000) including interest, delay damages, costs of suit, attorneys fees, general and specific damages, punitive and exemplary damages and

any other damages as provided by law.

Respectfully submitted,


/s/ Ryan K. Thompson

**Ryan K. Thompson, LA Bar #38957**
**TRIAL ATTORNEY**
660 Richland Ave
Baton Rouge, LA 70806
T: (323)271-8032
E: RKTsocialjustice@gmail.com

/s/ Jessica F. Hawkins

**Jessica F. Hawkins, LA Bar #38263**
P.O. Box 5072
Baton Rouge, LA 70802
T: (915)217-9192
E: jessicahawkins0421@gmail.com


/s/ Thomas Frampton

**Thomas Frampton, LA Bar # 35775**
580 Massie Road
Charlottesville, VA 22903
T: (202( 352-8341
E: tframpton@law.virginia.edu


**COUNSEL FOR TERNELL L. BROWN**