UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TERNELL L. BROWN,

      Plaintiff,
  v.

BATON ROUGE POLICE DEPARTMENT, TROY LAWRENCE, JR., in his individual capacity, MATTHEW WALLACE, in his individual capacity, UNKNOWN FEMALE OFFICER, in her individual capacity, MURPHY PAUL, in his individual and official capacities, CITY OF BATON ROUGE, and PARISH OF EAST BATON ROUGE.

      Defendants.

No. 23-cv-1313-JWD-EWD

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS AND MOTION FOR A MORE DEFINITE STATEMENT**

This is a case about sexual humiliation inflicted by BRPD officers pursuant to BRPD policy. The City-Parish's motion to dismiss—which defends as *lawful* a BRPD policy that authorized officers to kidnap and strip a grandmother, "forcing her to spread her vagina and buttocks" for visual inspection with a flashlight, based on the thinnest suspicion of wrongdoing, *see* Compl. ¶¶ 6-28—should be denied swiftly. And it should be denied in forceful terms: If it truly remains the City-Parish's position that its strip-search policy is consistent with the Fourth Amendment, as the City-Parish's top lawyers insist, absolutely nothing constrains the City-Parish's rank-and-file police officers from the most grotesque abuses of power. The intervention of federal authorities represents the only possible path to reform.

1

### I. The Fourth Amendment does not, in fact, authorize police officers to forcibly inspect a non-arrestee's vagina and rectum based on "reasonable suspicion."

The gravamen of the City-Parish's motion to dismiss is that "[b]ased upon the date of the revised policy in conjunction with the above-referenced Fifth Circuit precedent, BRPD's [strip search of non-arrestees] policy is legally proper and supported by applicable jurisprudential authority." Dkt. 19-2, *10. Conspicuously, though, the City-Parish fails to actually discuss the facts or holdings of any of the "applicable jurisprudential authority."

In 1993, the U.S. Supreme Court addressed the outer limits of a police officer's search authority during a *Terry* stop. *Minnesota v. Dickerson*, 508 U.S. 366 (1993). The Court explained that during a lawful *Terry* stop, "where police have reasonable suspicion based on specific and articulable facts to believe that a driver may be armed and dangerous, they may conduct a protective search for weapons." 508 U.S. at 374. The protective search, a "limited" patdown of the detainee's person, must be based on reasonable suspicion *not* of a criminal offense (which is what justifies the temporary seizure), but rather based on reasonable suspicion "that the individual whose suspicious behavior [the police officer] is investigating at close range is armed and presently dangerous," *id.* at 373 (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)). If, during such a permissible search, "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent," the officer does not violate the Fourth Amendment by seizing it. *Id.* at 375-76. But if ascertaining the "incriminating character of the object" requires the officer to "squeez[e], slide[e], and otherwise manipulat[e] the contents of the [detainee's] pocket," *id.* at 378, then the officer has conducted "a further search, one not authorized by *Terry* or by any other exception to the warrant requirement," *id.* at 379. Such a search is "constitutionally invalid." *Id. Accord United States v. Ponce*, 8 F.3d 989 (5th Cir.

1993) (holding officer violated detainee's Fourth Amendment right to be free from unreasonable search when officer searched his pocket after initial frisk revealed suspicious "little bump").

The Parish Attorney argues that although the Fourth Amendment would not have allowed officers to put their hands in Ms. Brown's pocket, it *did* authorize police officers to force Ms. Brown to strip naked, spread her vagina and buttocks, and expose her most intimate parts to an inspection with a flashlight. *See* Dkt. 19-2, *10 (defending search of Ms. Brown's vagina based on "individualized reasonable suspicion for a strip search"). But the City-Parish offers no argument to support this illogical position, except by vague allusion to Fifth Circuit cases that the City-Parish refuses to discuss.

The reason the City-Parish does not discuss the facts or holdings of the "applicable jurisprudential authority" is because none of the Fifth Circuit cases cited by the City-Parish supports the City-Parish's position. Three of the five cited cases deal with searches by correctional officials after an arrestee has been placed in their custody based on probable cause or an arrest warrant. For better or worse, many decades of U.S. Supreme Court jurisprudence make clear that such searches—*by* correctional officials, *of* prisoners, *after* a lawful arrest, *inside* a jail/prison—may be "reasonable" under the Fourth Amendment even if they would be "unreasonable" in the free word. *See* Justin Driver and Emma Kaufman, *The Incoherence of Prison Law*, 135 HARV. L. REV. 515, 554 (2021) ("It is worth emphasizing how thin and how aberrational this conception of privacy [represented by the Supreme Court's Fourth Amendment jurisprudence for people inside jails and prisons] looks against the wider legal landscape."); *Hinkle v. Beckham County*, 962 F.3d 1204, 1231-42 (10th Cir. 2020) (discussing *Bell v. Wolfish* and its progeny). For example, in *Jimenez v. Wood County, Texas*, the Fifth Circuit affirmed (en banc) a plaintiff's award of $60,000, and $157,394.60 in attorney's fees based on an illegal strip-search of an arrestee by jail officials. 660 F.3d 841 (5th Cir. 2011). At the trial, both plaintiff and

3

defendants agreed that when there is probable cause for an arrest and the arrestee is taken to a local jail, corrections officials cannot impose a blanket strip search policy on all arrestees; rather, corrections officials must have, at minimum, reasonable suspicion that the arrestee is concealing weapons or contraband before a correctional officer can strip search them. *Id.* at 843 ("The County did not object to the 'reasonable suspicion' requirement."). The *Kelly* and *Foti* cases are the same. *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996) ("Jail officials may strip search a person arrested for a minor offense . . . only if they possess a reasonable suspicion that he is hiding weapons on contraband."); *Stewart v. Lubbock County*, 767 F.2d 153, 154 (5th Cir. 1985) ("The policy at the Lubbock County jail . . . permitted a strip search of any arrestee."). None of these cases purported to overrule *Minnesota v. Dickerson* or announce some new "strip search exception" to the ordinary requirements governing the limited scope of a *Terry* patdown by police officers of non-arrestees.[1]

The City-Parish's fourth case, *United States v. Olcott*, is a 45-year-old per curiam opinion that addresses searches by federal customs inspectors of travelers entering the United States at an international border. 568 F.2d 1173, 1173 (5th Cit. 1978). *Olcott's* irrelevance to this case requires no extended demonstration. *See United States v. Ramsey*, 431 U.S. 606, 616 (1977) ("That searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons . . . crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration."). That which is "reasonable"

---

[1] A better case for the City-Parish to have cited might have been *Florence v. Board of Chosen Freeholders*, 566 U.S. 318 (2012), which arguably abrogated in part some of the "jailhouse search" cases cited above. But *Florence* (like the cases cited above) was expressly limited to arrestees, the jailhouse setting, and searches by correctional officials, and even *Florence* does not authorize a blanket strip-search policy by correctional officials of all arrestees, as the Tenth Circuit's meticulous opinion in *Hinkle v. Beckham County* makes clear. *See* 962 F.3d 1204, 1231-42 (10th Cir. 2020).

4

under the Fourth Amendment changes at international borders, just as it does when a lawfully arrested prisoner encounters correctional officials.

The final case alluded to by the City-Parish, *Williams v. Kaufman County*—the City-Parish's sole authority that addresses policing and *Terry* stops—directly supports Ms. Brown's argument. *Compare* Dkt. 19-2, *10 (suggesting *Williams* authorizes a strip-search of a detainee if an officer has individualized reasonable suspicion) *with* 352 F.3d 994, 1004 (5th Cir. 2003) (holding the opposite). There, the Fifth Circuit denied qualified immunity and affirmed a finding of municipal liability after an unlawful strip search conducted by police, explaining that clearly established U.S. Supreme Court precedent confirmed "police must have either articulable *reasonable suspicion* to frisk an individual or *probable cause* to search him." 352 F.3d at 1004 (emphasis in original). There, police officers executed a search warrant at a club with a "violent history" and argued that it was reasonable for them to think patrons might be armed or in possession of drugs. *Id.* The Fifth Circuit explained that "[e]ven if . . . it had been reasonable for [the police officer defendants] to suspect that plaintiffs were armed or carrying drugs, [strip] searching them would still have been unlawful: *Ybarra* [*v. Illinois*, 444 U.S. 85 (1979)] reiterated that the *Terry*-style search is limited to a frisk for *weapons*. Harris's officers frisked the plaintiffs, but found no evidence of weapons, drugs, or contraband to ripen into the probable cause required for a full-blown search." *Id.*

This Court is familiar with the lengths that the City-Parish will go to defend its sexually humiliating strip-search practices from public scrutiny. *Frampton v. City of Baton Rouge/Par. of E. Baton Rouge*, No. 21-CV-362-JWD-SDJ, 2022 WL 90238, at *35 (M.D. La. Jan. 7, 2022) (finding "overwhelming evidence in this case shows that the City/Parish acted in bad faith and in retaliation" for publicity regarding BRPD strip-searches). This context should inform any assessment as to whether the

City-Parish inadvertently omitted the facts and holdings of its "applicable jurisprudential authority" or did so intentionally: once again, the City-Parish attempts to defend its strip-search policy through arguments "not warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing law." *See* Fed. R. Civ. P. 11(b)(2).

## II. Defendant's motion for a more definite statement is similarly "disingenuous"

This Court is also familiar with "disingenuous" Rule 12(e) motions in police brutality cases. In *Snearl v. City of Port Allen*, the Municipal Defendants filed a motion for a more definite statement, arguing that "plaintiffs do not allege which officers were present at the scene when Queen was allegedly shot, and this information is crucial." *Snearl v. City of Port Allen*, No. CV 21-455-JWD-RLB, 2022 WL 2129088, at *13 (M.D. La. June 14, 2022). Plaintiff responded that a complaint need only satisfy the minimal pleading requirements of Rule 8, and that in any event, any deficiency was attributable to the Municipal Defendants "who have refused at every turn to supply any information to [plaintiff] about the events." *Id.* This Court had little trouble rejecting the defendant's motion. *Id.* As the Court explained, "it is disingenuous for these defendants to claim that the operative pleading does not 'give the defendant fair notice of what the plaintiff's claims are and the grounds upon which it rests,' particularly with respect to which officers were involved, when (1) Plaintiffs expressly list many officer names, and (2) these defendants would certainly have access to that information." *Id.* (internal citation omitted).

The City-Parish's Rule 12(e) motion is far more disingenuous than the one at issue in *Snearl*. **First**, the City-Parish does *not* even allege that Ms. Brown's complaint is "so vague or ambiguous that the party cannot reasonably prepare a response," as required by Rule 12(e); instead, the City-Parish suggests that "a more definite statement of fact" would be "useful" and "assist" the City-Parish. *See* Dkt. 19-2, *13-14. This alone should resolve the motion. **Second**, the City-Parish faults plaintiff for "not

itemiz[ing] any individual actions of each officer." *Id.* at *14. But the City-Parish offers no law or argument that such "itemization" is required by Rule 8, because no such requirement exists. **Third**, as in *Snearl*, the City-Parish has adamantly refused to confer on engage in the most basic discovery consultations required by Rule 26, *see* Dkt. 8 (Letter to Court) ("For two and half months, plaintiff has diligently sought to communicate with defendants. Unfortunately, this process remains ongoing, and the City/Parish has refused to meaningfully confer in the interim.").

The actual basis for the City-Parish's Rule 12(e) motion appears to be that the City-Parish disputes some of the factual allegations in Ms. Brown's complaint. Dkt. 19-2, *14 ("[F]actual events not materially connected to a *Terry* frisk took place during Plaintiff's traffic stop that created individualized reasonable suspicion of additional contraband . . ."). This is what an Answer is for. But the City-Parish seems loathe to file pleadings that might move this lawsuit forward in an ordinarily fashion. The City-Parish's Rule 12(e) motion is a textbook example of a motion "presented for an[] improper purpose, such as to . . . cause unnecessary delay."

### III. Ms. Brown has properly pleaded claims for *Monell* liability for Counts I and II

The City-Parish offers three paragraphs (Dkt. 19-2, *12-13) suggesting that Ms. Brown has failed to allege facts that would give rise to municipal liability for either Count I or Count II of her complaint. These contentions are addressed in turn.

#### A. Count I – *Monell* Liability for the Strip Search

The City-Parish moves to dismiss Count III alleging *Monell* liability for the illegal strip search of Ms. Brown, but fails to meaningful discuss the dispositive fact that Ms. Brown's *Monell* claim is predicated on a *written BRPD policy governing such strip-searches* (a physical copy of which Ms. Brown has cut-and-pasted into her complaint). *See* Compl. ¶¶ 30-32.

Even if there were no written strip-search policy, the long-standing BRPD practice of illegally strip-searching individuals like Ms. Brown (personally approved and ratified by BRPD Chief Murphy Paul) would suffice to establish *Monell* liability. As alleged in the complaint, the Baton Rouge Police Department's illegal custom of strip-searching people during traffic stops has been national news since 2021. *See* Compl. ¶¶ 60-65. It prompted Judge Brian Jackson to issue an extraordinary order suggesting that *criminal* charges might be appropriate against BRPD officers that same year. *See United States v. Green,* No. 20-CR-46-BAJ-SDJ (M.D. La. Dec. 29, 2020), Doc. 35 at 1. BRPD's policymaker was not only "deliberately indifferent" to the custom, but expressly approved of it. Compl. ¶¶ 66-70. Moreover, the City-Parish's motion to dismiss ignores the other well-pleaded factual allegations contained in the complaint that directly support the "practice or custom" allegations regarding strip-searches, including the following:

> BRPD's Street Crimes Unit regularly subjects all those brought to "the BRAVE Cave" to strip searches, including non-arrestees merely suspected of criminal wrongdoing; since January 2023, BRPD Street Crimes Unit conducted strip searches on approximately 1,000 individuals, including hundreds of individuals whose detention was based solely on reasonable suspicion of wrongdoing (or less); Hundreds of these individuals, like Mrs. Brown, were released without formal arrest; . . . in a May 2021 press conference, Chief Murphy Paul and Deputy Chief Myron Daniels defended the officers' strip searches at a public news conference; Chief Murphy Paul, with the input of Deputy Chief Myron Daniels, cleared the officers of any wrongdoing related to the illegal strip searches depicted [in a nationally viral] video; Chief Murphy Paul and Deputy Chief Myron ensured that BRPD officers conducted strip searches consistent with General Order No. 281's instructions that strip searches could be properly based on solely on an officer's suspicion of wrongdoing.

Compl. ¶¶ 33-38. Even if Ms. Brown did not have the "smoking gun" evidence of a formal written policy, it is hard to imagine factual allegations (which, again, must be accepted as true at this point) that could more firmly establish a pattern, practice, custom, and informal policy sufficient to give rise to municipal liability. Compl. ¶ 183. Likewise, Ms. Brown has alleged municipal policy regarding the unlawful search

8

based on a failure to train, Compl. ¶ 183; failure to discipline, Compl. ¶ 184; failure to supervise, Compl. ¶ 185; and ratification by the final policymaker. Compl. ¶ 186.

### B. Count II – *Monell* Liability for the Unreasonable Seizure

Ms. Brown has similarly pleaded sufficient facts to support municipal liability for her Fourth Amendment seizure claim.

As Ms. Brown's complaint makes clear, *everyone* in Baton Rouge law enforcement and the Baton Rouge legal community knew that Officer Troy Lawrence Jr. (who, like his father, Deputy Chief Troy Lawrence, Sr., has since been arrested) posed a grave danger to the Fourth Amendment rights of Baton Rouge citizens prior to his encounter with Ms. Brown. *See, e.g.,* Compl. ¶ 89 (citing Letter to Parish Attorney dated January 21, 2023) ("Officer Lawrence is going to seriously injure or kill someone if he remains on the force."). His partner in crime for much of this misconduct, the complaint alleges, was Matthew Wallace. And BRPD leadership, including BRPD Chief Murphy Paul, was personally aware of all of this, too.

They knew this because, time and again, Troy Lawrence Jr.—like other members of the infamous and now-disbanded Street Crimes Unit, including Matthew Wallace—violated the Fourth Amendment rights of Baton Rouge citizens. *See, e.g.,* Compl. ¶¶ 39-52 (systematic coverup of Street Crimes Unit abuses); ¶ 54 ("numerous incidents . . . involv[ing] Troy Lawrence Jr. needless[ly] escalating ordinary encounters, strip-searching Black citizens, and responding to criticism with violence"); ¶ 57 ("At the time of Mrs. Brown's encounter with him, no BRPD employee with Troy Lawrence Jr.'s seniority has been suspended by BRPD more times for misconduct (without being terminated) than Troy Lawrence Jr."); ¶ 57 (alleging Internal Affairs investigations into Matthew Wallace); ¶¶ 77-95 (discussing Troy Lawrence Jr.'s illegal seizure of another female motorist, obvious perjury to cover-up for incident, approval of such

9

Fourth Amendment violations by top BRPD brass; the Parish Attorney's indifference; and BRPD's unwillingness to apologize, even when failing to do so cost taxpayers an additional $15,000); ¶¶ 96-105, 137-139 (discussing senior BRPD officer's refusal to serve alongside Troy Lawerence Jr. because "I don't know what he is capable of. I feel that he has a lot of anger . . ."); ¶ 138 (discussing now-arrested Deputy Chief Troy Lawrence Sr.'s role in covering up his son's wrongdoing); ¶¶ 136-143 (discussing Lawrence and Wallace's teamwork in violating the Fourth Amendment rights of other Baton Rouge citizens and top BRPD leadership's cover-up of this wrongdoing); ¶¶ 140-149 (discussing Troy Lawrence Jr.'s malicious attack against other Baton Rouge motorists and sadistic treatment of detainee); ¶¶ 140-159 (discussing Lawrence and Wallace taking other detainees to the torture warehouse where the defendants violated the detainees Fourth Amendment rights); ¶ 160 (noting "BRPD Chief Murphy Paul personally received a complaint regarding the torture warehouse and Wallace/Lawrence's misconduct in January 2023; a second Internal Affairs complaint was received in April 2023"). As the complaint alleges, "If BRPD's Chief had responded to the complaints, Mrs. Brown's sexual humiliation (like the sexual humiliation of scores of other Baton Rouge citizens harmed at the torture warehouse) would not have occurred." Compl. ¶ 162. The complaint contains many more allegations of a similar kind. The City-Parish's motion to dismiss makes no attempt to address any of the foregoing, though all of these factual allegations are germane to one or more theories of *Monell* liability that Ms. Brown's complaint properly alleges for her unlawful seizure claim.

Moreover, the complaint alleges that BRPD kidnapped hundreds and hundreds of Baton Rouge citizens without probable cause—taking them to the BRPD torture warehouse known as "the BRAVE Cave"—for purposes of strip-searching them. *See* Compl. ¶¶ 33-38. The same factual allegations that make up the pattern and custom of Fourth Amendment *search* violations constitute factual allegations of

a pattern and custom of Fourth Amendment *seizure* violations, as well. *See* Compl. ¶ 180 (specifically "repeat[ing] and realleg[ing] all of the paragraphs in this complaint as if fully set forth herein against BRPD and all municipal defenadnts" in support of *Monell* liability for Count II).

Plaintiff's complaint states a valid *Monell* claim against the City-Parish regarding her wrongful seizure by Troy Lawrence, Jr. and Matthew Wallace pursuant to several independent theories: (1) widespread "pattern, practice, custom, and informal policy," Compl. ¶ 183; failure to train, Compl. ¶ 183; failure to discipline, Compl. ¶ 184; failure to supervise, Compl. ¶ 185; and ratification by the final policymaker. Compl. ¶ 186. To be clear, there is no requirement that Plaintiff pleads that BRPD has a longstanding pattern, practice, custom, and informal policy of letting Lawrence and Wallace *specifically* violate the Fourth Amendment (although the complaint certainly alleges as much). It would suffice to allege that such conduct was generally a "practice" or "custom" of the Baton Rouge Police Department for municipal liability to attach for this particular constitution violation. And Plaintiff has alleged sufficient facts to make the City-Parish liable for her claims based on multiple theories. The complaint alleges that BRPD evinced deliberate indifference to this *precise* type of harm recurring, and that Chief Murphy Paul refused to take the obvious steps that he could have done to better train, supervise, or discipline Lawrence and Wallace. As alleged in the complaint (and ignored in the City-Parish's motion to dismiss), the evidence will show that Chief Paul personally took steps to ensure Lawrence and Wallace were *not* more seriously disciplined, even when their track-record of criminal wrongdoing was well established.

### IV.     Plaintiff has no objection to the dismissal of duplicative claims

Ms. Brown agrees that claims against Chief Murphy Paul in his official capacity are effectively claims against the City-Parish. To the extent the City-Parish agrees that it is legally responsible for

11

wrongdoing committed by Baton Rouge Police Department as an entity, she has no objection to the dismissal of those claims either.

Respectfully submitted,

s/ Thomas W. Frampton
Thomas W. Frampton (La. Bar No. 35775)
580 Massie Road
Charlottesville, VA 22903
(202) 352-8341
tframpton@law.virginia.edu

***Attorney for Plaintiff***
