UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| TERNELL L. BROWN,<br><br>   Plaintiff,<br><br>v.<br><br>TROY LAWRENCE, JR., in his individual capacity, MATTHEW WALLACE, in his individual capacity, KATHERINE ALVARADO, in her individual capacity, CITY OF BATON ROUGE, and PARISH OF EAST BATON ROUGE.<br><br>   Defendants. | No. 23-CV-1313-JWD-EWD |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION</u>**

  Mrs. Ternell Brown—like many other citizens of Louisiana and the United States—takes medicine prescribed to her by a medical professional. It is legal. It is mundane. But to officers of the Baton Rouge Police Department ("BRPD"), the possession of one's prescription medicine on their person apparently evinces reasonable suspicion of a crime. And such suspicion warrants a highly invasive and traumatizing cavity search, which Mrs. Brown experienced on June 10, 2023.

  That this low level of suspicion lead to a highly invasive search was not an anomaly. The officers who directed the strip search of Mrs. Brown were acting in accordance with BRPD's own written policy. Indeed, BRPD General Order No. 281 provides "strip searches may be conducted on non-arrestees based on individualized articuable [sic] suspicion to frisk[.]" The U.S. Supreme Court has made unambiguously clear that law enforcement officers may conduct only a "frisk," as defined in *Minnesota v. Dickerson*, 508 U.S. 366 (1993), when officers have only reasonable suspicion of criminal wrongdoing. The "reasonable suspicion" standard used by BRPD, and employed by officers against Mrs. Brown, runs afoul of the Supreme Court's established

1

directives. In short, this policy, practice, and custom of the BRPD was the moving force behind multiple unconstitutional strip searches conducted on Ms. Brown and too many other Baton Rouge citizens.

Yet, remarkably, ***plaintiff has learned that this policy is still in effect to this day***. Notwithstanding the public statements of Baton Rouge officials disavowing the practice, owning mistakes, and promising changes—despite the existence of this lawsuit and many others—BRPD has failed to change their written policy to comply with constitutionally-mandated protections. BRPD Chief Murphy Paul Jr. told *The Washington Post* in an interview approximately five months ago that "the department regularly revises its policies and that he would examine the strip-search policy after investigating the allegations in the lawsuits."[1] And, generally responding to allegations made in these other lawsuits concerning the BRAVE Cave, Chief Paul Jr. stated "We made a mistake on this one, . . . I've got to own that."[2] But nothing changes.

The heart of Plaintiff's instant motion is that, despite mountains of evidence that BRPD's policy and procedure with respect to strip searches is illegal and has severely harmed citizens and continues to harm its citizens, the City-Parish still has not changed it. As a citizen of Baton Rouge, and as someone who has already been victimized by BRPD's unconstitutional policy, Mrs. Brown needs this Court's assistance to alleviate a substantial risk to her constitutional rights will be violated again during the pendency of this lawsuit. BRPD cannot be allowed to wait out multiple federal civil rights lawsuits before changing this glaring systemic defect. It should be enjoined from continuing this policy immediately.

Below is a brief (very partial) timeline illustrating the need for an injunction:

- **March 10, 2016 -** A federal jury in the Middle District of Louisiana unanimously finds that BRPD officers illegally strip-searched a Baton Rouge citizen, and "that a moving force behind [the officer's] strip search of [the citizen] was a custom or policy of defendant the City of Baton Rouge, of which the City of Baton Rouge knew or should have known and was deliberately indifferent." The Chief of Police

---

[1] Daniel Wu, *Louisiana police held detainees in 'torture warehouse,' lawsuits say*, The Washington Post (Sept. 20, 2023), https://www.washingtonpost.com/nation/2023/09/20/baton-rouge-police-brave-cave-lawsuits/
[2] *Id.*

tells local newspapers that BRPD will review and fix its strip-search policy. The policy is not changed.

- **January 1, 2021** – A federal judge in the Middle District of Louisiana issues an unusual order identifying potentially criminal wrongdoing by a team of BRPD officers who strip-searched a young man and his minor brother in public. Even after video of the strip-search becomes international news, BRPD takes no action against any of the officers for the strip-search. The policy is not changed.

- **May 26, 2021** – Only after video of the aforementioned becomes public, the Mayor-President issues a strongly worded statement "stand[ing] by the federal judicial ruling in this case" and promising that "the officers involved must be held accountable." None of the officers are disciplined for the strip-search and the policy is not changed.

- **January 7, 2022** – This Court issues a length ruling granting a Preliminary Injunction ordering the City-Parish to stop prosecuting undersigned counsel for sharing a video exposing the strip-search practices. The policy is not changed.

- **August / September 2023** – BRPD's strip-search policy again makes international news when a series of civil rights lawsuits are filed. Once against, BRPD Chief of Police and the Mayor-President issue a series of solemn statements promising "accountability" and insisting they take the matter "seriously." BRPD Chief of Police tells the Washington Post that he "own[s]" the "mistake[s]" that BRPD made and assures the press that the strip-search policy will be "reviewed." The policy is not changed.

- **November 27, 2023 –** The Parish Attorney files a full-throated defense of the strip-search policy insisting, "individualized reasonable suspicion is a proper standard from which a strip search can take place."

- **February 4, 2024** – The Parish Attorney and Assistant Parish Attorney ignore an inquiry as to whether the strip-search policy remains in effect.

- **February 7, 2024** – The Parish Attorney and Assistant Parish Attorney respond to a second inquiry, stating it would be improper to confirm/deny the existence of the policy and directing plaintiff to pursue an answer such questions through the Public Records Request process.

- **February 8-18, 2024 –** The Parish Attorney ignores a request for consent to file an amended complaint.

## FACTUAL BACKGROUND

As set out in Plaintiff's Amended Complaint, the Baton Rouge Police Department ("BRPD") has a long-standing and unabated custom of unconstitutional strip searches. Mrs. Brown experienced one such search.

3

On June 10, 2023, BRPD Detective Matthew Wallace and BRPD Officer Troy Lawrence, pulled over a black Dodge Charger driven by Mrs. Brown and her husband. *Id.* at 4. After initiating a search of the vehicle, without the consent of Mrs. Brown or her husband, the officers discovered medicine bottles filled with her prescription medications. *Id.* Despite Mrs. Brown informing the officers that these bottles were merely her lawfully prescribed medications, they accused her of the (non-existent) crime of mixing different medications in the same bottle. *Id.* Mrs. Brown pleaded with the officers and informed them that she could provide proof she was in lawful possession of the medications. *Id.* at 4-5. But the officers refused. *Id.* at 5. They surmised she may have bought the medications "off the streets." *Id.* They failed to take any investigatory steps to determine Mrs. Brown's legal possession of the medicine. Instead, they seized and transported her to an unmarked warehouse colloquially known (among BRPD officers and staff) as the "BRAVE Cave." *Id.*

Apparently with a suspicion that Mrs. Brown may have been illegally possessing the medications, or something even more nefarious, the officers detained her in the BRAVE Cave for over two hours. *Id.* at 6. This clandestine warehouse has been adapted by the BRPD Street Crimes Unit to conduct interrogations and investigatory activities without the presence of other BRPD/correctional staff. *Id.* at 5. It was within the BRAVE Cave that Defendants Lawrence, Wallace, and Alvarado "forced [Mrs. Brown] to spread her vagina and buttocks for inspection and examined her vagina using a flashlight." *Id.* at 6. Without finding any weapons or other contraband, the officers released Mrs. Brown without any charges. *Id.* After she subsequently filed a complaint in person at BRPD Headquarters, Mrs. Brown was told that the officers had done nothing wrong and that her treatment was proper. *Id.* Indeed, the officers were acting in strict accordance with BRPD's own written policy—the same policy that had led to other disturbing strip searches.

For example, on January 1, 2020, Defendant Officer Lawrence Jr. illegally strip searched a minor child. *Id.* at 13. The Hon. Judge Brian A. Jackson issued an unusual order suggesting the arresting officers might be prosecuted for engaging in criminal misconduct. After an internal

4

investigation, the BRPD determined that the strip search of Mr. Green was *consistent with BRPD policy*. *Id.* at 15. And there is credible reason to believe Mr. Green and Mrs. Brown were not the only victims of such ruthless and wanton behavior. As Plaintiff avers in her Amended Complaint: "Since January 2023, BRPD Street Crimes Unit conducted strip searches on approximately 1,000 individuals, including hundreds of individuals whose detention was based solely on reasonable suspicion of wrongdoing (or less)." *Id.* at 9.

Despite these condemnable episodes, BRPD has continued to use a patently unconstitutional policy as their official procedure for strip searching those suspected of illegal conduct. According to General Order No. 281, and as described, *supra*, BRPD instructs its officers that "strip searches may be conducted on non-arrestees based on individualized articulable reasonable suspicion to frisk[.]"This is the directive followed by officers in the events involving Mrs. Brown and countless others. *And this policy is still being followed at the time of this filing*.

Undersigned counsel recently attempted to communicate with the Parish Attorney and an Assistant Parish Attorney about this subject. *See* Amended Complaint, ¶¶ 58-62. The undersigned asked the Parish Attorney whether BRPD continues to use General Order No. 281 as its official policy. *Id.* The Parish Attorney refused to substantively respond, but BRPD confirmed that the strip-search policy remains in effect. *Id.* That is, officers are *still* being instructed that they may strip search non-arrestees based on reasonable suspicion alone. This is noteworthy for many reasons. But perhaps most significant is the continued threat citizens of Baton Rouge face from BRPD. Mrs. Brown is one such citizen. She has already suffered a traumatizing and highly invasive cavity search based on little to no articulable suspicion of illegal conduct. She continues to live in Baton Rouge. She is therefore subject to the jurisdiction of BRPD, and with it, the threat of General Order No. 281's use on her—again. This threat is substantial. It is real, and it warrants relief.

## ARGUMENT

**I.     Standard of Review**

A preliminary injunction is warranted if the movant demonstrates: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

**II.    Analysis**

   **A.    Plaintiff is Likely to Succeed on the Merits Because BRPD's Strip Search Policy is Blatantly Unconstitutional**

To evaluate preliminary injunction requests, courts use "a bewildering variety of formulations of the need for showing some likelihood of success." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2948.3 (3d ed. 2021). Some courts require the movant to show that the likelihood of success on the merits is greater than fifty percent. *See, e.g.*, *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). The Fifth Circuit, however, recognizes that a finding of 'substantial likelihood' does not require a finding of a fixed quantitative value. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Rather, "a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Id.* Thus, when the other factors weigh strongly in favor of an injunction, "a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).

"To show a likelihood of success, the plaintiff must present a *prima facie* case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). Further, in analyzing the first element, "the Court looks to 'standards provided by the substantive law.'" *Soudelier v. Dep't of State Louisiana*, No. CV 22-2436, 2022 WL 3686422, at *1 (E.D. La. Aug. 25, 2022) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir.1990)).

6

The substantive law of strip searches proves that BRPD's policy, which is still in force today, is patently unconstitutional. "Time and again, [the Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (cleaned up). One such exception is "[a] protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause[.]" *Id.* at 373. But this "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 26 (1968)). "Without a warrant or consent, *Terry* permits only a limited pat-down search to determine whether the suspect is carrying a weapon." *United States v. Zavala*, 541 F.3d 562, 576 (5th Cir. 2008) (citing *United States v. Jenson*, 462 F.3d 399, 408 (5th Cir. 2006)). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry*[.]" *Dickerson*, 508 U.S. at 373. Fifth Circuit caselaw squarely holds that "**police must have** either articulable reasonable suspicion to frisk an individual or **probable cause to search him**." *Williams v. Kaufman Cnty.*, 352 F.3d 994, 1004 (5th Cir. 2003) (citing *Ybarra v. Illinois*, 444 U.S. 85, 88 (1979)) (emphasis added).

A frisk, as permitted in *Terry*, is "a patdown of a suspect." *Id.* Strip searches, on the other hand, can be "humiliating" and "embarrassing." *Id.* at 1013. And "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons." *Ybarra*, 444 U.S. at 93–94.

These limitations are unequivocally disregarded in BRPD's own written policy—which is still being enforced despite numerous warnings of unconstitutionality, and acknowledgements from BRPD Chief Murphy Jr. in public statements that it would be reviewed.[3] BRPD General

---

[3] Wu, *Louisiana police held detainees in 'torture warehouse,' lawsuits say*, WASHINGTON POST (Sept. 20, 2023)

7

Order No. 281 instructs officers, in no uncertain terms, that "***strip searches may be conducted on non-arrestees based on individualized articulable reasonable suspicion to frisk***[.]" This is directly contrary to *Terry*'s "narrow" holding and the Fifth Circuit's caselaw requiring probable cause for a search. *Ybarra*, 444 U.S. at 94; *Williams*, 352 F.3d at 1004. The first preliminary injunction factor thus weighs heavily in Plaintiff's favor.

### B. There is a Substantial Threat of Irreparable Harm Because Mrs. Brown—along with other citizens of Baton Rouge—Is Likely to be Subject to an Unconstitutional Strip Search Again.

"It has been repeatedly recognized by the federal courts that violation[s] of constitutional rights constitutes irreparable injury as a matter of law." *Springtree Apartments, ALPIC v. Livingston Par. Council*, 207 F. Supp. 2d 507, 515 (M.D. La. 2001). "While embarrassment or inconvenience standing alone may not rise to the level of irreparable harm, continued deprivations of one's constitutional rights unquestionably does. *Wilkerson v. Stalder*, No. CIV.A. 00-304-JJB, 2014 WL 357704, at *6 (M.D. La. Jan. 31, 2014), *rev'd sub nom*. *Wilkerson v. LeBlanc*, 596 F. App'x 252 (5th Cir. 2014). The constitutional freedom to be free from invasive searches or seizures is fundamental to our system of justice. *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."). Indeed, the Fifth Circuit has previously upheld a grant of equitable relief against a municipal policy of unconstitutional and unreasonable strip searches. *Stewart v. Lubbock Cnty., Tex.*, 767 F.2d 153, 157 (5th Cir. 1985).

Here, there is a substantial threat that Mrs. Brown would be subject to another unconstitutional strip search. Aside from the evidence of other, actual unconstitutional strip searches alleged by Plaintiff, the policy at force behind these searches is still in effect. Further, the situations where Mrs. Brown could find herself subject to a mere "reasonable suspicion" standard

8

for a strip search are numerous, and <u>not like</u> the attenuated circumstances of the oft-cited Supreme Court case on equitable relief standing, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

"In *Lyons*, the possibility of repeated injury was highly attenuated in that the petitioner would need to have another encounter with the police and demonstrate that all L.A.P.D. officers always used chokeholds in non-deadly situations or the City authorized them to act in that manner . . . whereas the Plaintiffs here may likely face repeated injury" because ***it is certain*** the BRPD continues to employ the same policy that led to Mrs. Brown's constitutional injury along with other citizens of Baton Rouge. *Spector v. Norwegian Cruise Line Ltd.*, No. CIV.A. H-00-2649, 2007 WL 2900588, at *6 (S.D. Tex. Sept. 28, 2007). "Unlike the petitioner in *Lyons*, there is a real threat that if Plaintiff[] were to [be stopped by BRPD officers again], the same conditions would exist." *Id.* (citing *Lyons*, 461 U.S. at 107 n.8 ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry.")) (emphasis in original).

There is a further distinction in this case from *Lyons* that has already been recognized by the Fifth Circuit as overcoming speculation as to standing for equitable relief: Mrs. Brown was doing nothing wrong. "We find a critical factual distinction between *Lyons* and the instant case which dictate[s] a different result. [Mrs. Brown] (unlike Lyons) was engaged in an activity protected by the Constitution." *Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. 1990) (citing *Kent v. Dulles*, 357 U.S. 116, 126–27 (1958); *Worthy v. United States*, 328 F.2d 386, 392 (5th Cir. 1964)). *Lyons* has been used approvingly by "courts [because they] 'have been unwilling to assume that the party seeking relief will repeat the type of *misconduct* that would once again place him or her at risk of that injury.'" *Id.* (quoting *Honig v. Doe*, 484 U.S. 305, 320 (1988)) (emphasis in original). "No such reluctance, however, is warranted here." *Id.* "The injury alleged to have been inflicted did not result from an individual's disobedience of official instructions and [Mrs. Brown] was not engaged in any form of misconduct[.]" *Id.* at 234–35. In fact, it is still unclear *why* Mrs. Brown was stopped by BRPD officers to begin with. And as alleged in her Amended Complaint, she was never cited for *anything*, let alone a traffic infraction like in *Lyons*. *Compare* Amended

Complaint at 6, *with Honig*, 484 U.S. at 320 (finding that in *Lyons* "no threat [existed] that [a] party seeking injunction barring police use of chokeholds would be stopped again for traffic violation or other offense, or would resist arrest if stopped.").

Mrs. Brown was simply existing on June 10, 2023, and sitting in her car with her husband. She was never charged with anything, and did not resist officers at any point. Her routine legal conduct led to police intervention which led to a cavity search. And the policy that led to this violation is still in force. This continued threat is not attenuated. Accordingly, the irreparable harm element is met.

    **C.**    **Balancing the Competing Claims of Injury Weighs Heavily in Mrs. Brown's Favor**

Third, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987).

Here, this element weighs indisputably in Mrs. Brown's favor. She faces the potential of *another* highly invasive strip search by BRPD officers. Many reasons support this prediction. For one, the unconstitutional policy is still in effect. Further, she continues to carry her prescription medication on her person and she continues to live in Baton Rouge. She could really be stopped at any point by BRPD officers and may be subject to a strip search based on the thinnest veil of reasonable suspicion, like what happened to her in June 2023. *Cf. Lyons*, 461 U.S. at 107 n.8 ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry.").

On the other hand, Defendants' would obtain little to no benefit whatsoever from continuing an unconstitutional strip search policy. In fact, ***Defendants may themselves benefit from the preliminary injunction***. To date, they have shown a shocking level of incompetence and disregard for constitutional protections, and perhaps a court order to cease the practice will actually prevent them from harming Baton Rouge citizens in the future, and from defending more federal civil rights claims in the process. Thus, this element is met.

    **D.**    **The Public Interest Supports the Entry of Preliminary Injunctive Relief**

"It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F.Supp.2d 90, 105 (D.D.C. 2012) (collecting cases). Here, there is a strong and availing public interest in preventing Defendants from continuing the policy of the Baton Rouge Police Department as pronounced in General Order No. 281. Citizens of Baton Rouge have already been harmed by this policy, and the prospect of future harm is, at this point, *likely*. Strip searches are intrusive, traumatizing, and should be reserved only for the most appropriate scenarios. That is why the U.S. Supreme Court has articulated strong protections against Fourth Amendment overreach. The public relies on these protections, and they should be enforced here.

WHEREFORE, premises considered, Plaintiff respectfully requests this court issue an order enjoining Defendants from acting on their written policy, General Order No. 281, and to cease strip searches based on reasonable suspicion alone.

Respectfully submitted,

s/ Thomas W. Frampton
Thomas W. Frampton
(La. Bar No. 35775)
580 Massie Road
Charlottesville, VA 22903
(202) 352-8341
tframpton@law.virginia.edu

***Attorney for Plaintiff***

### CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of February 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants who have appeared in this case.

/s/Thomas Frampton